AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

COPY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>RALPH MAURICE METTERS | DOCKET NO.<br>14 - 2014M |
|---|---|
| | MAGISTRATE'S CASE NO. |

Complaint for violation of Title 18, United States Code, Sections 1349 and 1028A

| NAME OF MAGISTRATE JUDGE<br>Honorable Margaret A. Nagle | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>2011 through today | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**See Attachment**

LODGED

2014 OCT - 9  AM 10: 22
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

FILED
CLERK, U.S. DISTRICT COURT
OCT 9 2014
CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Sherine Ebadi |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br>Margaret A. Nagle | DATE<br>October 9, 2014 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Andrew Brown, 11th floor, x0102      REC: Detention      Warrant

AB

**Attachment**

## Count One (18 U.S.C. § 1349)

Beginning in or before 2011, and continuing through at least October 8, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendant RALPH MAURICE METTERS, together with others known and unknown to the United States Attorney, conspired to commit wire fraud, in violation of Title 18, United States Code, Section 1343. The object of the conspiracy was carried out, and to be carried out, in substance, as follows: Defendant and his co-conspirators would steal the identifying information of victims and then transfer by wire the victims' funds into accounts defendant controlled. Defendant would also tell victims he would invest their money, but would instead use their money for his own living expenses and to pay his co-conspirators. Through this conspiracy, using wires that crossed state lines, defendant defrauded victims out of over $5,000,000.

## Count Two (18 U.S.C. § 1028A)

Beginning in or before 2011, and continuing through at least October 8, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendant RALPH MAURICE METTERS knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1343, Conspiracy to Commit Wire Fraud, as charged in Count One.

## AFFIDAVIT

I, Sherine D. Ebadi, being duly sworn, do hereby state the following:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for five years.  I am currently assigned to the Los Angeles Field Office, Long Beach Resident Agency, where I am responsible for investigating violations of federal criminal statues over which the FBI has investigatory jurisdiction, to include, but not limited to, bank fraud, mail fraud, wire fraud, securities fraud, investment fraud, money laundering, and identity theft. I have received specialized training in these types of investigations.  As a result of my training and experience, I have familiarity with federal laws, to include wire fraud statutes.

2.   This affidavit is made in support of a complaint against and arrest warrant for RALPH MAURICE METTERS ("METTERS"), also known as ("aka") Maurice Metters, aka Malachai Levy, aka Moe Levy, aka Maurice Jones for violating Title 18, United States Code, Section 1349 (Conspiracy to Commit Wire Fraud) and Title 18, United States Code, Section 1028A (Aggravated Identity Theft).  This affidavit is also made in support for search warrants for METTERS' residence, vehicles, and previously seized cellular telephones belonging to METTERS.  This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of the requested complaint, arrest warrant, and search warrant and does not purport to set forth all of my knowledge or all of the information pertaining to the investigation into this matter.  Unless specifically

1

indicated, all conversations and statements described in this affidavit are related in substance and in part only.

3.     I learned the facts recounted below from witnesses I interviewed, or witnesses for whose interviews I was present, documents obtained and reviewed through the course of my investigation, physical observations, and from other law enforcement officers, including SA Stephen Morrow of the United States Secret Service ("USSS").

## II.   PREMISES TO BE SEARCHED

The premises to be searched (collectively, the "SUBJECT PREMISES") are:

a.  5749 BRIANHEAD DRIVE, CORONA, CALIFORNIA 92880 ("METTERS' Residence").  METTERS' Residence is a two story, beige colored, single family home on the west side of BRIANHEAD DRIVE.  The numbers "5749" are affixed just above the garage on the south east corner of the residence. There is a white colored, 2-car, attached garage that faces east.  In front of the garage is a large driveway suitable for three cars.  The premises to be searched includes the entire lot, including any garage(s), shed(s), and vehicle(s) parked in the driveway or garage.

b. A DARK GREY, FOUR-DOOR MASERATI with paper dealer plates and VIN number ZAMCE39A470026893.

c. A WHITE HYUNDAI SONATA with California license plate 6VPX630 and VIN number 5NPEB4ACXCH457678.

d. A MANILA ENVELOPE WITH "DR #111306136" and "(3)CELL PHONES" written on the front and Law Enforcement Evidence Seal tape affixed to the opening of the envelope.

### III. ITEMS TO BE SEIZED

The items to be seized are listed in Attachment B and incorporated by reference.

### IV.   SUMMARY OF INVESTIGATION

4.   The FBI, USSS, and IRS have been investigating METTERS for a conspiracy to commit wire fraud, which first succeeded to our knowledge on March 6, 2013.  Investigation to date has revealed that METTERS and others, both known and unknown at this time, caused a fraudulent wire transfer of $556,375.82 from a Bank of America ("BOA") account belonging to Wilkie Lexus, a car dealership located in Haverford, Pennsylvania, to a BOA account controlled by METTERS and held in the name of his company, Omni Finance.  METTERS and others caused this wire transfer by gaining access to Wilkie Lexus' online banking profile ("OLB"), which gave them balance information and the names of the authorized signors on the account.  METTERS and others then had Wilkie Lexus's incoming phone calls diverted to a Google Voice number.  METTERS and others then forged a wire transfer request and, when BOA called Wilkie Lexus to verify the authenticity of the wire transfer request, fraudulently authorized BOA to transfer $556,375.82 from Wilkie Lexus' BOA account to METTERS' Omni Finance account.  METTERS and his cousin, Jeffrey Gaddis ("Jeffrey") went to the BOA Branch in Seal Beach, California where METTERS instructed Jeffrey to withdraw the money in the form of several cashier's checks.

5.   In addition to the acts above, beginning in about 2011 and continuing to present, METTERS has been conducting various investment fraud scams.  In 2011 and 2012, these investment fraud scams dealt mostly with soliciting investors to participate in prime bank instrument trade

programs. METTERS would purport to have access to an investment program and an inside trader at the bank. METTERS would provide materially false and misleading information to investors via email, telephone, SMS messages and in contracts regarding what would be done with their money and what kind of returns they could expect. METTERS instructed investors wire money to an attorney escrow account, or what investors were let to believe was an attorney escrow account. METTERS then had the money wired to an account under his name or in his control. METTERS made little to no effort to use the investors' funds in a manner consistent with his promises and withdrew the vast majority of the funds in the form of cash. No investors received their promised profits or the return of their principal investment. This scam resulted in an estimated loss to investors of approximately $4,000,000.

6. In 2013, METTERS began conducting a different investment fraud scam. METTERS solicited at least one investor, Michael Byrd, to participate in a foreign currency trade program. Again, METTERS provided materially false and misleading information to Byrd via email, telephone, SMS messages, in contracts and in person conversations regarding what would be done with his money and what kind of returns he could expect. Thus far, this scam has resulted in a loss of at least $500,000. METTERS appears to be continuing this scam to this day with new, unknown victims.

## V.   STATEMENT OF PROBABLE CAUSE

### A.   Ralph Metters, Omni Finance, and Mo Betta Advisors

7. METTERS is a 37 year-old male who resides in Corona, California. METTERS has established a number of limited liability companies ("LLC") and corporations ("Inc.") in California and Nevada, including Omni Finance

LLC ("Omni Finance"), Mo Betta Advisors LLC ("Mo Betta"), Reprime International Inc., and Tier One International Inc. METTERS also uses the names Maurice Metters, Malachai Levy, Maurice Jones, and Moe Levy. I know this because METTERS' girlfriend, Portia Love, Metters' cousins, Jeffrey and Javonte Gaddis ("Javonte"), Metters' former roommate, Cody Gowens ("Gowens"), and one of Metters' victims told me this. Additionally, METTERS presented a false Michigan driver's license in the name of Malachai Levy to officers of both Hawthorne Police Department ("Hawthorne PD") and the San Bernardino County Sheriff's Department ("SBCSD") when stopped. Copies of these false driver's licenses were provided to me by Hawthorne PD and SBCSD.

8. Based upon business filings, bank records, and witness statements, I believe METTERS established Omni Finance as a Nevada LLC on January 17, 2012. METTERS was listed as the President of Omni Finance until January 23, 2013, when METTERS's name was removed and the name Jeffrey Gaddis was added as President. In January 2012, METTERS opened a BOA checking account held in the name of Omni Finance and ending in 3158 (the "METTERS Omni Finance account"). METTERS was the only authorized signor on this account until March 18, 2013, when Jeffrey was added as an authorized signor. Per Jeffrey, METTERS said that he needed Jeffrey's help managing his business transactions. METTERS told Jeffrey that he needed someone he could trust and someone he knew would not steal his money.

9. Based upon business filings, bank records, and witness statements, I believe METTERS established Mo Betta as a California LLC on July 7, 2011. The officers of Mo Betta are listed as METTERS and Malachai

Levy.   METTERS opened and held several bank accounts in the name of Mo Betta, including two BOA accounts, two JP Morgan Chase Bank accounts, and two Comerica Bank accounts.   METTERS is the only signor on all of these accounts.

10.   Based upon a business record search on the Nevada Secretary of State website, I believe that Reprime International Inc. and Tier One International Inc. are Nevada corporations.   Malachai Levy (METTERS's alias) and Jeffrey are listed as officers for both.   Documents related to both Reprime International Inc. and Tier One International Inc. were found in and seized from METTERS' vehicle by SBCSD.   Copies of these documents were provided to me by SBCSD Detective Frank Root.

**B.   Wilkie Lexus**

11.   Daniel Martin Inc., doing business as ("dba") Wilkie Lexus ("Wilkie Lexus"), is a car dealership located in Haverford, Pennsylvania.

12.   Wilkie Lexus holds a bank account at BOA ending in 6143 (the "Wilkie Lexus account").   As detailed below, at the time of the wire transfer at issue in this affidavit, there were a number of authorized signors on the Wilkie Lexus account, including Wilkie Lexus Sales Manager, Donna Moccia.

**C.   Wilkie Lexus Online Banking Profile is Hijacked**

13.   An online banking ("OLB") profile allows an account holder to access his or her account from any computer or digital device that connects to the internet.   By accessing his or her account online through an OLB profile, an account holder can perform virtually any banking transaction, including deposits, withdrawals, and wire transfers. According to BOA's Executive Escalations Team Leader, Tracey Miles

("Miles"), and former Client Sales Support Associate, Heather Carr

("Carr"), in March 2013 the Wilkie Lexus account had an OLB profile.

14.   Per Miles and Carr, BOA has two separate OLB platforms, one for consumer accounts and one for commercial accounts.   Consumer accounts are for individuals and small businesses.   Commercial accounts are for large businesses.   Consumer accounts can be accessed online by providing the account holder's name and social security and/or tax identification number.   Commercial accounts can be accessed online only after a series of authentication questions are answered.   Typical authentication questions include amounts of recently cleared checks, account balance information, and other transactional and account profile information.

15.   According to BOA call logs and call recordings, on March 5, 2013, BOA's Consumer Accounts call center received five calls regarding the Wilkie Lexus OLB profile.   Three of the calls were not transferred or recorded.   The other two calls were transferred to a BOA Commercial Accounts call center and were recorded.   The caller on both recorded calls claimed to be Donna Moccia, Wilkie Lexus' Sales Manager and an authorized signor on the Wilkie Lexus account.   During one of these calls, "Moccia" requested that a new password be generated for Wilkie Lexus' OLB profile. This request was granted and "Moccia" was provided with the new password.

16.   Also according to BOA call logs and call recordings, on March 5, 2013, after BOA's Consumer Accounts call center received the above-described calls, BOA's Commercial Accounts call center received two other calls about the Wilkie Lexus account, again from a caller claiming to be Donna Moccia.   Both calls came from telephone number (714)773-2503 (the "prepaid phone").   Both calls were recorded.   I received records from

Verizon Wireless regarding telephone number (714)773-2503 ("the prepaid phone"), and learned that the number is associated with a prepaid phone. Therefore, there is no person identified as the subscriber to the number.

17.  During one of calls from the prepaid phone, "Moccia" changed her contact number in BOA's system from (621)525-0900 (Wilkie Lexus's main number) to (714)773-2503, the number for the prepaid phone.  During a subsequent call from the prepaid phone, "Moccia" asked what the dollar limit was for outgoing wire transfers requested by fax as opposed to through the OLB system.  "Moccia" also asked what BOA's protocol was for verifying wire transfer requests received by fax.  "Moccia" was told that only one signature was needed and that a call-back procedure would be performed.

18.  According to Wilkie Lexus General Manager, Jeffrey Deren ("Deren"), and Miles, BOA commercial account holders can conduct wire transfers online, but such wire transfers require an OLB profile, a username, passcode, and a randomly-generated number that can be obtained only by someone who has a physical token for the account.  Wilkie Lexus has about two physical tokens, both of which are in the possession of upper management/ownership.

19.  According to BOA call logs and call recordings, the next day, on March 6, 2013, BOA received two more calls from the prepaid phone about the Wilkie Lexus account.  The first call was to a BOA automated line. The caller set up a contact identification profile for "Donna Moccia" and checked the account balance in the Wilkie Lexus account.  The second call was to BOA's commercial call center.  Again, the caller claimed to be Donna Moccia.  "Moccia" asked a number of questions about authorized

signors on the Wilkie Lexus account, and then asked what number BOA would use to contact Wilkie Lexus if contact was necessary. "Moccia" was told that BOA would call (621)321-8083 (the "Wilkie Lexus number").

20.   According to BOA Fraud Investigator, David Smith, on March 6, 2013, Wilkie Lexus's OLB profile was accessed from IP address 64.134.157.94.  On June 27, 2013, I received records from AT&T Internet Services showing that, on March 6, 2013, this IP address was assigned to FedEx Office #0319, located at 12223 Central Ave. Chino, California 91710 ("the FedEx Office").

D.   **Wilkie Lexus Telephone Calls are Diverted**

21.   Per Deren, Wilkie Lexus's telephone service provider is Netcarrier Telecom Inc. ("Netcarrier").  According to Netcarrier's Director of Security, Dan Bartley, on March 6, 2013, Netcarrier's Technical Support Representative, Michael Bartfield ("Bartfield"), received a call from the prepaid phone requesting that all incoming calls to the Wilkie Lexus number be forwarded to (484)416-0650 ("the internet phone").  The caller identified herself as "Donna."  Since Donna was not the authorized contact on Wilkie Lexus's Netcarrier account, Bartfield told "Donna" that the authorized contact on the account, "Tom," needed to make the forwarding request.

22.   Per Bartley, shortly after Bartfield received the call from "Donna," Netcarrier Technical Support Representative, Andres Garcia, received a call from a caller claiming to be "Tom."  "Tom" requested that all incoming calls to the Wilkie Lexus number be forwarded to the internet phone.  The request was processed and incoming calls to the Wilkie Lexus

number started forwarding to the internet phone on March 6, 2013, at approximately 01:04:33 p.m. Eastern Time.

23. Per Bartley, "Tom" also added Donna Moccia to the list of people authorized to make changes to Wilkie Lexus's Netcarrier account. "Tom" provided an email address of moccia1donna@yahoo.com and a telephone number of (909)565-0716 as contact information for Moccia.

24. On April 13, 2013, I received documents from Sprint/Nextel regarding cellular telephone number (909)565-0716. These documents show that the subscriber for this cell phone number is METTERS's company, Mo Betta. As detailed further below, on May 31, 2013, I interviewed METTERS's cousin, Javonte Gaddis ("Javonte"). Javonte told me that METTERS's cell phone number is (909)565-0716 – the number "Tom" used to place the request to divert Wilkie Lexus calls to the internet phone.

25. On June 14, 2013, I received documents from Yahoo! Inc. regarding email address moccia1donna@yahoo.com. These documents show that moccia1donna@yahoo.com is not a valid email address.

26. On April 16, 2013, I performed a provider search for the number associated with the internet phone to which "Tom" had Netcarrier forward all of Wilkie Lexus's phone calls. I learned that the number was an internet based telephone number owned by Bandwidth.com. Bandwidth.com Vice President, Lisa Freeman, told me that this particular number was provided to Google Inc. and that the number was a "Google Voice" number.

27. On July 3, 2013, I received information from Google Inc. that they had no records for the internet phone because they only maintain records for active numbers and the internet phone's number is not an

10

active Google Voice number.   All information for deactivated numbers is deleted upon deactivation.

**E.    The Fraudulent Wire**

28.   Per Miles and Carr, on March 6, 2013, BOA's Wire Exception Team, located in India, received a paper wire transfer request by fax from fax number (909)613-1620 (the "Wire Request").   The Wire Exception Team handles paper wire transfer requests, as opposed to online requests, for commercial accounts.   The Wire Request sought to wire $556,375.82 from the Wilkie Lexus account to the METTERS Omni Finance account.   The Wire Request was signed with the name "Donna Moccia."   I reviewed the date and time stamp on the header of the Wire Request.   The fax header line shows that the fax was sent on March 6, 2013 at 11:05 a.m. Pacific Time.

29.   I conducted an internet search for (909)613-1620 and discovered that it is a fax number for the FedEx Office identified above as "the FedEx Office," the same location from which Wilkie Lexus's OLB profile was accessed on the same day, March 6, 2013.

30.   I reviewed surveillance photographs from the FedEx Office from March 6, 2013 at approximately 11:06 a.m. Pacific Time.   They show a black female standing by the fax machine.

31.   On July 1, 2013, I interviewed the FedEx Office Manager, Glenn Brady ("Brady").   Brady told me that WiFi service at the FedEx Office is free and does not require a password.   Anyone can connect to the FedEx Office's WiFi from a WiFi-capable device within range.   Brady believed that the WiFi could be accessed from the parking lot outside of the FedEx Office too.   Brady also said that the woman who used the fax machine associated with fax number (909)613-1620 at approximately 11:05 a.m.

Pacific Time on March 6, 2013 appeared to be alone and was only in the store a short period of time.

32.   On March 6, 2013, at approximately 2:08 p.m., Eastern Time, Carr received an email from a member of BOA's Wire Exception Team regarding the Wire Request.  Per Carr, the Wire Exception Team had some questions regarding whether or not the wire requestor was an authorized signor on the Wilkie Lexus account. Carr was asked to verify the Wire Request with Wilkie Lexus.

33.   Carr looked up the Wilkie Lexus contact number in BOA's Navigator system, and the number she found was the Wilkie Lexus number, calls to which, as of 1:04:33 p.m., Eastern Time, were being forwarded to the internet phone.  Carr called the Wilkie Lexus number, and a woman who claimed to be Donna Moccia answered.  Carr told "Moccia" that "Moccia" was not authorized to request wire transfers on the Wilkie Lexus account. "Moccia" told Carr that she was authorized.  Carr told "Moccia" that she would check again and get back to her.  Carr looked through all of the Wilkie Lexus signature cards and found a supplemental signature card listing Donna Moccia as an authorized signor.  Carr called "Moccia" back and asked if the Wire Request was authorized.  "Moccia" said it was.

34.   On March 6, 2013, at approximately 2:35 p.m., Eastern Time, Carr sent an email to the Wire Exception Team notifying them that Wilkie Lexus had authorized the Wire Request, and that it could be processed.  The same day, after Carr sent that email, $556,375.82 was wired from the Wilkie Lexus account in Pennsylvania to the METTERS Omni Finance account in California.

**F.   Metters Picks Up the Money**

35.   On March 6, 2013 in the afternoon, METTERS and Jeffrey entered a BOA branch in Seal Beach, California.   METTERS told BOA Seal Beach Branch Manager, Samantha Tressler ("Tressler") that he (METTERS) was trying to obtain cashier's checks by withdrawing money that had come into the METTERS Omni Finance account from a wire transfer.   Per Tressler, METTERS identified to whom the cashier's checks should be made payable and in what amounts.

36.   Tressler took Jeffrey to the teller window.   Tressler told the teller what cashier's checks to issue.   The teller then issued five cashier's checks as follows:

> a.   one made payable to Jeffrey Gaddis for $9,500;
>
> b.   one made payable to Javonte Gaddis for $250,000;
>
> c.   one made payable to Javonte Gaddis for $25,000;
>
> d.   one made payable to Cody Gowens for $150,000; and
>
> e.   one made payable to Cody Gowens for $15,000.

37.   Jeffrey took the cashier's checks and signed the withdrawal slip.   Jeffrey then cashed the cashier's check made payable to him (for $9,500).   Jeffrey and METTERS left the BOA at approximately 2:41 p.m., Pacific Time.

38.   I reviewed time-stamped surveillance photographs from the Seal Beach BOA branch from the date and time when the above transactions occurred.   I compared the surveillance photos to California DMV photos for METTERS and Jeffrey, and believe they depict the same people. Additionally, I showed the surveillance photos to Jeffrey and he confirmed that the photos depicted himself and METTERS.

### G.   Metters Gets the Cash

39.   After leaving the bank on March 6, 2013, METTERS, Jeffrey, and Javonte drove to American Check Cashing ("ACC") in Rancho Cucamonga, California.   Per Gowens, METTERS called him on March 6, 2013 and told him to come to ACC because he needed help cashing a check.   METTERS, Javonte, and Gowens went into ACC and negotiated the four cashier's checks that were made payable to Javonte and Gowens.

40.   Per ACC owner, Tony Rasool ("Rasool"), METTERS called Rasool before coming in on March 6, 2013.   Rasool knows METTERS as Malachai Levy. Rasool told me that METTERS was a regular customer who often cashed checks at ACC and that METTERS would typically call Rasool before coming to cash checks.   When METTERS called ACC on March 6, 2013 and identified himself, Rasool knew who it was.   METTERS told Rasool that he was coming in with some other people, and that they had BOA cashier's checks in large dollar amounts.   METTERS asked Rasool if he could cash the checks.   Rasool told METTERS that as long as the individuals cashing the checks had the proper identification and the checks were real, he would be able to cash them. When METTERS, Javonte, and Gowens entered ACC, Rasool made copies of Javonte's and Gowens' driver's licenses and asked them to complete a personal information form because they were the parties to whom the cashier's checks were made payable.   On the personal information forms Javonte and Gowens listed their employer as METTERS' company, Omni Finance.   Each listed Omni Finance's phone number as (323)253-0274.

41.   I have received documents from Sprint/Nextel regarding cellular telephone number (323)253-0274.   These show that the subscriber to that phone number is METTERS's company, Mo Betta.

42.   Rasool cashed the check made payable to Javonte for $25,000, and the check made payable to Gowens for $15,000.  Rasool told METTERS that he would need three days to get cash from the bank to cash the remaining two checks for $250,000 and $150,000.

43.   On May 31, 2013, I interviewed Javonte.  Javonte told me that METTERS is his cousin and Jeffrey Gaddis is his brother.  Javonte also told me that METTERS owns a company called Omni Finance that METTERS operates from his laptop computer at his home in Corona.  Javonte has never worked for Omni Finance.  Javonte said that METTERS took him and Gowens to ACC on March 6, 2013, to cash four cashier's checks.  Javonte said that METTERS told him and Gowens what to write on the personal information form.  Javonte said that ACC could only cash the smaller checks that day.  Javonte said that METTERS took the cash from the $25,000 and $15,000 checks that Javonte and Gowens cashed, and gave Javonte $500 as compensation for helping care for METTERS' children.  Javonte said that METTERS picked up the money from the larger checks a few days later.  Javonte also said that METTERS has asked a number of his (METTERS') girlfriends to cash checks for him before.

44.   On October 17, 2013 I interviewed Cody Gowens.  Gowens told me that on March 6, 2013 METTERS called him and asked him to come to a check cashing place in Rancho Cucamonga to sign a check.  METTERS had previously told Gowens that he needed Gowens to cash a check so that METTERS could get his house back.  Gowens arrived at the check cashing place prior to METTERS.  Gowens saw METTERS, Javonte, and Jeffrey all get out of METTERS' car.  Once inside, Gowens had to put his thumbprint on two checks and fill out a form.  METTERS told Gowens what to write on the form.  Gowens never

15

worked for Omni Finance.  Omni Finance was one of METTERS' companies.
METTERS operates this company from his home on a laptop computer.
Sometime after Gowens signed the checks, Gowens heard that METTERS' had a
"trunk of cash".

45.  On October 31, 2013, I interviewed Jeffrey Gaddis.  Jeffrey told
me that Mo Betta Advisors, Omni Finance, and Reprime International were
companies owned by METTERS.  METTERS worked out of his home on his laptop
computer.  METTERS asked Jeffrey to help him with banking transactions
because METTERS said he did not have a valid form of identification.  On
March 6, 2013, METTERS, Jeffrey, and Javonte drove to the BofA in Seal
Beach.  METTERS told Jeffrey that he needed to withdraw cash from a wire
that came in.  Once at the BofA in Seal Beach, METTERS had Jeffrey
withdraw five cashier's checks: two payable to Javonte, two payable to
Gowens, and one payable to Jeffrey.  METTERS told Jeffrey to cash his
cashier's check for $9,500 at the bank.  After the bank, METTERS, Jeffrey,
and Javonte went to a check cashing place in Rancho Cucamonga where Gowens
met them.  Jeffrey waited outside of while METTERS, Javonte, and Gowens
went inside.  METTERS told Jeffrey that they had to come back in a couple
days to pick up the cash.  A day or so later, Jeffrey went back to the
check cashing place with METTERS to pick up the money.  After picking up
the money, METTERS and Jeffrey went to Portia Love's house in Rancho
Cucamonga where they made a video with the cash on METTERS' white colored
iPhone 5.  After making the video, METTERS took Jeffrey to drop off money
to two different women at nearby parking lots.

46.  According to Rasool, a few days after March 6, 2013, METTERS
returned to ACC.  Rasool recalled that METTERS was with two young black

16

males.  Rasool gave METTERS the cash from the $150,000 and $250,000 checks at this time.

47.  I reviewed bank records for the METTERS Omni Finance account.  I found that, before $556,375.82 was wired from the Wilkie Lexus account to the METTERS' Omni Finance account on March 6, 2013, the balance in the METTERS Omni Finance account was -$19.45.  Therefore, the cashier's checks drawn from METTERS' Omni Finance account and cashed by Rasool at ACC, are traceable to the Wilkie Lexus wire transfer of $556,375.82.

## H.   METTERS Moves the Money

48.  In reviewing bank records for the METTERS Omni Finance account, I learned that, in addition to the five cashier's checks discussed above, four more cashier's checks were obtained from the account on March 11, 2013, at a BOA branch in Pomona, California.  Each of these four cashier's checks is also traceable to Wilkie Lexus's $556,375.82.

49.   These four cashier's checks were issued as follows:

    a.   one made payable to Brandi Bradley for $9,500;

    b.   one made payable to Gerrod Knight for $9,500;

    c.   one made payable to Portia Love for $9,500; and

    d.   one made payable to Javonte Gaddis for $9,500.

50.  Further, on March 18, 2013, a wire in the amount of $50,000 was sent from the METTERS Omni Finance account to an Etrade account in the name of Destiny FX LLC (the "Etrade account").  On March 20, 2013, a second wire in the amount of $9,000 was sent from the METTERS Omni Finance account to this same Etrade account.  The $59,000 transferred in these two transactions is traceable to Wilkie Lexus's $556,375.82.

51.  Per Jeffrey, METTERS told him to go to BOA on March 11, 2013 and March 18, 2013 to perform various financial transactions from METTERS' Omni Finance account.   METTERS went with Jeffrey to the bank on each occasion and gave Jeffrey specific instructions on how much to wire and to whom.

52.  On June 21, 2013, I interviewed Etrade investigator, James Chambers ("Chambers").   Chambers told me that he reviewed the Etrade account and noticed a number of incoming wires, some of which were from "Malachai Levy" (one of METTERS's aliases).   Chambers spoke to the account holder, Robert Treat, who explained that he (Treat) was starting a nightclub and Levy was an investor.

53.  On June 4, 2013, I reviewed toll records for METTERS' two cellular phones (909)565-0716 and (323)253-0274 and noted that Brandi Bradley, Gerrod Knight, and Portia Love are three of the ten most frequent callers to and/or from METTERS.

54.  On June 6, 2013, I interviewed BOA Investigator, David Smith ("Smith").   Smith told me that, in addition to the $59,000 that was wired from the METTERS Omni Finance account to the Etrade account, he also identified three other wires sent from BOA accounts to the Etrade account as follows:

        a.   $9,500 from Portia Love's account;

        b.   $9,500 from METTERS' Tier One International Inc. account;
and

        c.   $9,000 from METTERS' Reprime International Inc. account.

55.  On May 16, 2013, I interviewed Portia Love and she told me that METTERS is the father of her child.   Love further told me that on March

18

18, 2013, METTERS came to her home and gave her $9,500 in cash and told her to wire it to an Etrade account.   METTERS told Love it was for an investment.

56.   On September 24, 2014, I interviewed Brandi Bradley and she told me that METTERS gave her a $9,500 and asked her to cash it for him. Bradley cashed the check at Bank of America and gave the cash to METTERS. METTERS gave Bradley $500 from the $9,500.

57.   On June 25, 2013, I received documents that were seized from METTERS' vehicle upon his arrest by SBCSD.   Among these documents was a copy of a contract between Destiny FX LLC and Ahmad Davis.   The contract was signed by Malachai Levy as the "Managing Director" of Destiny FX LLC. Also found in the vehicle, were copies of the wire receipts from Felina Smith and Portia Love to Destiny FX LLC's E-Trade account

I.   **Wilkie Lexus Interviews**

58.   On June 10, 2013, I interviewed Wilkie Lexus Parts and Service Manager, Tom Manley ("Manley").   Manley told me that he did not contact Netcarrier to request that incoming calls to the Wilkie Lexus number be forwarded to any other number.   Manley told me that he never authorized anyone else to do this in his name.

59.   On June 10, 2013, I interviewed Wilkie Lexus Sales Manager, Donna Moccia ("Moccia").   Moccia told me that she did not contact Netcarrier to request that incoming calls to the Wilkie Lexus number be forwarded to any other number.   Moccia told me that she did not authorize anyone else to do this in her name.   Moccia also told me that she never completed a wire transfer request to have funds wired from the Wilkie Lexus account to any other account.   Moccia did not authorize anyone else

19

to do this in her name.  Moccia had reviewed the Wire Request and was sure
that the signature for "Donna Moccia" on the document was not hers.
Moccia never received a call from Carr regarding the Wire Request and
never told Carr that she (Moccia) authorized the wire.

## VI. METTERS' Defrauds New Victim of $500,000

J.   Victim Interview

60.  On February 25, 2014, I interviewed Michael Byrd and he told me
the following.  Byrd is the owner of Bakecrafters Inc., an international
bakery business headquartered in Tennessee.  Byrd resides in Ooltewah,
Tennessee.  In, or around September and October 2013, Byrd was looking for
an investment that would provide funds he could use to build a new office
building for Bakecrafters Inc.

61.  In October 2013, Michael Byrd was introduced to METTERS for the
purpose of investing in foreign currency (FOREX).  METTERS purported to be
the owner of Destiny FX LLC., the entity through which Byrd's FOREX
investment would be run.  METTERS communicated with Byrd via telephone,
email, SMS text messages, and in person.  Byrd told me that telephone
number used by METTERS is (562)375-8908.  Between October 2013 and
February 2013, Byrd has had repeated contact with METTERS at this number.

62.  As a result of METTERS' representations, including that Byrd's
funds would be held in escrow and not leave escrow until Byrd had received
his profits, Byrd wired $500,000 to Haven View Escrow for the purpose of
his investment with METTERS and Destiny FX LLC.  After numerous delays and
excuses from METTERS as to why the investment had not paid out, Byrd
became concerned.  In early December 2013, Byrd contacted Haven View
Escrow to ensure that his funds were not disbursed without his

20

authorization.  At this time, escrow officer Christy Boulinger told Byrd that his funds had already been disbursed per an authorization to release form signed by Byrd and notarized.  Boulinger sent Byrd a copy of the authorization to release form.

63.  Byrd told me that he did not sign the form and did not have the form notarized.  Byrd told me that he was not in California on the purported date the document was signed and notarized.  Byrd told me that he did not, either verbally or in writing, authorize escrow to disburse his funds.

64.  Byrd confronted METTERS, who admitted to sending the document to escrow, having the funds wired to his bank account.  METTERS assured Byrd that his money was safe and that the investment was continuing as promised.  Byrd did not receive a refund of his initial investment, nor a return on his investment as promised by METTERS.

## K.  Following the Stolen Money

65.  On January 30, 2014, I received records from Jennifer Smiley of the Commodities and Futures Trade Commission (CFTC).  These records showed that $500,000 was wired by Byrd to Haven View Escrow in October 2013.  The records further showed that on November 15, 2013, Haven View Escrow received an authorization to release document allowing Haven View Escrow to disburse Byrd's $500,000 minus $5,000 in escrow fees to a BofA account in the name of Prime One International Association ("The Prime One Account").

66.  In February 2014, I received records from BofA regarding the Prime One Account.  The records showed that on November 15, 2013, $495,000 was wired from the Haven View Escrow account into the Prime One Account.

The signor on the Prime One account is Priscilla Sanders.  Per Jeffrey Gaddis, Sanders is a known associate of METTERS.  The mailing addresses on the Prime One Account were 18215 Foothill Blvd. #116, Fontana, California and 2026 N. Riverside Avenue #C181, Rialto, California.  Both of these addresses are associated with Felina Smith.  Smith is a known associate of METTERS who previously wired $9,500 to Destiny FX LLC's Etrade account.  A review of METTERS' cell phone toll records showed that Sanders and Smith were among the top 10 people that called or were called by METTERS.  Additionally, in an interview on September 24, 2014, a close associate of METTERS, Britani Jefferson told me that she saw a driver's license for Sanders and mail addressed to Sanders in METTERS' vehicle.  METTERS told Jefferson that Sanders "had good credit" so he had lots of things put in her name.

## L.   Additional Conduct Relating to the Items to Be Seized

67.   During the course of my investigation, I have been provided information from other FBI agents, State, Local and Federal law enforcement agencies, and financial institutions regarding investigations into various fraud schemes involving METTERS.  These investigations include:

a. A US Treasury check scheme in which METTERS obtained US Treasury checks in other names including Jose Velasquez, Jose Flores and John Cotton.  METTERS had Wells Fargo Bank employees Shekema Myrick and Nydia Ortega open accounts in Velasquez, Flores and Cotton's names and give full access to those accounts to METTERS.

b. A Prime Bank investment fraud scheme in which METTERS solicited investors to invest in bank instruments which METTERS claimed he would

provide to a trader to make the investors enormous profits.  The following individuals were identified as being co-conspirators in METTERS' investment fraud schemes: Ramona Maddrey, aka Karen Maddrey of Omni Financial and Prefect Funding; Deloris Elgammal; Bill Anderson and Paul Rutherford of PLDM; Scott Koster of Alicorn Capital Management; Richard James Tucker of Synergy Finance; Cornell Price; Robert Treat; Sean Winston; and Ryan Carter of New Plus Inc.  The following individuals were identified as being victims of METTERS' investment fraud activities: Nicholas George of CNG Capital; Jason Watson of Inrefco, Doug Neil of Televera Business Investments; Teresita Osorio, Don Ramsey of Cardinal Group Services; Ashleigh Crable; Carla Thompson, Claudia Villalba and Christina Yanez; Billie C. Miles; Deandra Bryant; Jeff Sorenson; Kelly Dean; Beverly Lee; Tim Failing; Lynette Casiano; and Jonathan Thacker.

 i. Review of bank records for Mo Betta Advisors, Omni Finance, and Woghiren and Associates showed that large sums of money were received from some of the above listed victims and others not yet identified for no legitimate business purpose.

 ii. Britani Jefferson told me that in 2011, METTERS solicited her cousin, Ashleigh Crable to invest with the promise of 3-5 times her principle in return.  METTERS told Jefferson and Crable that he would invest in overseas banks and bank instruments.  Crable invested $30,000 with METTERS and never received any return on her money.

 iii. Nicholas George told me that METTERS promised millions of dollars of profit to a number of investors, including George.  Toward the end of 2011, George wired $150,000 to the Woghiren and Associates account for the benefit of Mo Betta Advisors.  George never received

any profits or a return of his principle.   METTERS communicated with George via email and SMS text.

iv. Rashawna Randle told me that in 2011 and 2012, METTERS told her that he found investors to provide capital for their concert and event promotions business.   METTERS told Randle that these investors would send money to the Woghiren and Associates account in Randle's name.   METTERS then instructed Randle to cut cashier's checks to METTERS' or wire the money to an account under the control of METTERS.   Sometime later in 2012, RANDLE began receiving calls from angry investors who never received their returns.

c. Attempts to hijack other businesses' online banking profiles for the purpose of wiring money to himself.   The following business entities have been identified as potential or actual victims of METTERS' in this scheme: Stralem, Eisneramper, Valentine USA Inc., Jewish Communal Fund, Bulthaup Corporation, Glorious Foods Inc., Express Scripts, Kilimanjaro Advisors LLC., and Hi Tech Pharmacal.

## V. METTERS' RESIDENCE

68.   On August 21, 2014, I interviewed Song Feng and Wei Liu, the property owners of 5749 BRIANHEAD DRIVE., CORONA, CALIFORNIA (METTERS' Residence).   Feng and Liu told me that from around August 2013 to present, they rent 5749 BRIAHNHEAD DRIVE to a man matching METTERS' description and a woman matching Portia Love's description for $2700 in cash per month.

69.   On August 15, 2014, I interviewed Christopher Murillo, the neighbor living immediately adjacent to the south of 5749 BRIAHNHEAD DRIVE.   Murillo told me that from sometime in the fall of 2013 to present,

Portia Love, Portia's mother Marilyn, and Portia's boyfriend reside at 5749 BRIAHNHEAD DRIVE. Murillo told me that Portia's boyfriend (METTERS) drives a GREY MASERATI with dealer plates.

70. On August 15, 2014 I interviewed Deputy Todd Lewis of the Riverside Sheriff's Department. Deputy Lewis told me that he responded to a 911 call at 5749 BRIAHNHEAD DRIVE in early August 2014. Deputy Lewis told me that he spoke to Marilyn Clayburn, aka Marilyn Cook at the residence. Cook told Deputy Lewis that she lived at the residence with her daughter, Portia Love, and Love's boyfriend Maurice Metters, who also went by the name Malachai Levy. Cook told Deputy Lewis that METTERS did not have a job, but drove a MASERATI and was involved in fraud. Deputy Lewis also saw mail at the residence that was addressed to Malachai Levy.

71. On August 18, 2014, surveillance was conducted by FBI agents at 5749 BRIAHNHEAD DRIVE. Agents saw METTERS come and go from the residence in a dark GREY MASERATI with dealer plates. In the late evening, METTERS returned to the residence and parked the MASERATI in the garage of 5749 BRIANHEAD.

72. On September 26, 2014, surveillance was conducted by FBI agents at 5749 BRIAHNHEAD DRIVE. Agents saw METTERS come and go from the residence in a WHITE HYUNDAI SONATA with California plate 6VPX630. Agents also followed METTERS to an office building located at 3821 Guasti Drive, Ontario, California. According to California Department of Motor Vehicles, 6VPX630 is registered to Felina Smith. Felina Smith is an associate of METTERS' who has conducted financial transactions for METTERS in the past, as described previously.

73.  On October 7, 2014, I interviewed a confidential reliable source.  This source told me a number of things about METTERS and his fraud schemes that I was able to independently corroborate, as described in more detail below, and nothing that I was able to disprove.  This source told me that METTERS was currently living with Portia Love on BRIAHNHEAD DRIVE.  This source also told me that METTERS was currently driving a dark GREY MASERATI that was registered to someone else.

## EVIDENCE OF METTERS' CONTINUING FRAUDULENT SCHEME

74.  Jeffrey Gaddis, Javonte Gaddis and Cody Gowens, each told me that they previously resided with METTERS for parts of 2012 and 2013.  Each of them told me that METTERS conducted all of his business from home on his laptop computer and cell phone.  Gowens and Jeffrey Gaddis told me that they saw numerous file folders containing documents related to METTERS' businesses.  Gowens and Jeffrey Gaddis told me that they overheard numerous conversations METTERS had on his cell phone regarding his "investments".

75.  A confidential reliable source told me that METTERS kept both electronic and paper documentation of his fraudulent activities in his residence and in his car.  This source told me that METTERS worked on a laptop computer which METTERS kept in his residence or in his car.  This source told me that METTERS utilized virtual office space located in Ontario, California to meet with clients.  This source told me a number of things about METTERS that I was able to independently corroborate such as locations of previous residences, names of METTERS' numerous business entities, details of previous financial transactions, and dynamics of relationships with various other individuals.

76.   This source told me that METTERS and Love had a number of fake driver's licenses and social security cards.   This source told me that METTERS kept firearms in his residence and in his car.   Police reports indicate that when METTERS was arrested by SBCSD, two guns were found in the trunk of his car, and that when METTERS was arrested by Hawthorne PD, a gun holster was found in his car.

77.   This source told me that METTERS moves frequently and does not keep anything in his name because he does not want to be found.   From my investigation, I learned that METTERS' previous and current residences, cars and phones are all in someone else's names and that METTERS frequently changes his phone number and phone service provider.   This source told me that METTERS did this so that he could not be found.

78.   This source told me that METTERS has not had a real job in approximately 10 years and has only been doing fraud since that time. This source told me that METTERS is currently doing fraud and is waiting for money to come in from a new victim investor.

**EXPERTISE**

Based on my training and experience, I know the following:

79.   Individuals involved in bank fraud and investment fraud schemes keep evidence of their schemes at their residences, specifically on their laptop computers or other digital devices, in their automobiles, and in storage structures such as garages.   This evidence includes account statements, wire transfer receipts, withdrawal and deposit slips, identity profiles, incorporation documents, account applications, credit cards, driver's licenses and other forms of identification associated with the scheme.   Individuals in such schemes also frequently keep or maintain

lists of victim information to include, names, dates of birth, social security numbers, address, account numbers, passwords, and so forth. More sophisticated criminals sometimes also employ public storage units or safety deposit boxes to store some of the tools of their trade or proceeds.

80. Close associates of METTERS told me that METTERS works out of his home on his laptop computer and on his cell phone. Additionally, when METTERS was stopped by Hawthorne PD, multiple documents were seized from METTERS' vehicle that were evidence of a fraud scheme, to include fake driver's licenses, bank records and investment contracts. When METTERS was stopped by SBCSD, multiple documents were seized from METTERS' vehicle that were evidence of a fraud scheme, to include wire transfer receipts, fake driver's licenses, stolen identity profiles, investment contracts, business incorporation documents and bank records.

81. Individuals in bank fraud and investment fraud schemes often keep large sums of cash at their residence. METTERS' bank account activity shows that he withdraws the money from his schemes in the form of ATM withdrawals and cashier's checks made payable to associates. The cashier's checks are then cashed and the cash is given to him or he makes cash withdrawals from the accounts. Witnesses interviewed stated that METTERS carried large sums of cash and that METTERS paid with cash when he went to Las Vegas, or out to nightclubs.

82. Individuals involved in bank fraud and investment fraud schemes often keep information regarding their schemes and their victims on computers or computer storage devices. Based upon my training and experience, and information relayed to me by other law enforcement

personnel who specialize in the investigation of identity theft crimes, I have learned that it is common practice for individuals involved in bank fraud and investment fraud schemes to use and maintain computers at their residence.  Suspects often use computers to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  This case in particular involved the electronic access of victim bank account profiles and the use of an internet based phone.  Also, many of the people I interviewed stated that METTERS worked out of his house on his cell phone and laptop computer. Computers are often employed by individuals involved in bank fraud and investment fraud for the purpose of creating false online profiles/emails/phone numbers/websites, incorporating businesses, applying for fraudulent credit cards, obtaining personal identification information for the purpose of establishing fraudulent accounts and/or credit cards, using internet based trading sites to move and/or launder money, to communicate with co-conspirators via email/skype/and other internet based communication vehicles, and to keep a record of their crimes.

83.  Based on my training and experience and the facts in this case, I know that it takes an individual involved in bank fraud and investment fraud significant time and assistance from others in order to orchestrate their fraud.  Individuals involved in bank fraud typically support themselves with the proceeds of their fraud and do not stop until they are arrested.

84.  In the case of METTERS, he has no legitimate form of employment and yet he frequents night clubs, Las Vegas hotels and clubs, and other expensive venues in the Hollywood area.  According to Jeffrey, Javonte,

Gowens, and Clayburn, METTERS spends large sums of money at these clubs on a regular occasion. In addition, BOA notified the writer of 6 other potential victims who, similar to Wilkie Lexus, had their OLB profiles compromised, their phones forwarded to Google Voice numbers, and unauthorized transactions attempted on their accounts. A number of these potential victims were called from the same prepaid phone used in the Wilkie Lexus scheme described above. One of the wire transfer requests for a potential victim was sent from the same FedEx Office in Chino, California that was used to send the wire transfer request in the Wilkie Lexus scheme. The wire transfer request instructed over $700,000 to be wired to the account of one of METTERS' associates, Oluremi Daramola. In short, it does not appear that METTERS will stop participating in bank fraud, investment fraud, or other fraudulent acts until he is arrested.

85. Based on my training and experience, individuals involved in bank fraud maintain contact information such as telephone numbers and email addresses, of their co-conspirators. Typically, these individuals conduct business and communicate via cellular telephones, SMS text messages, Skype messages, and email.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

86. As used below, the term "digital devise" includes any electronic system or device capable of storing and/or processing date in the digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications

devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices.  Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises it is not always possible to search digital devices for digital data for a number of reasons, to include the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software in use today that it is impossible to bring to the search site all the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with specially training personnel who have specific expertise in the type of digital device, software application, or operating system that is being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devises can require the use of precise, scientific procedures that are designed to maintain the integrity of the digitial data and to recover "hidden", erased, compresses, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly,

files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat

programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

g. The United States has not attempted to obtain this data by other means.

34

## VII.  CONCLUSION

87.  Based on the foregoing, I submit there is probable cause to believe that RALPH MAURICE METTERS committed conspired to commit wire fraud in violation of Title 18 United States Code Section 1349, and committed aggravated identity theft, in violation of Title 18, United States Code, Section 1028A, in so doing, and that evidence of these and other offenses will be found at the SUBJECT PREMISES.


_____/S_____
SHERINE EBADI, Special Agent
Federal Bureau of Investigation


Subscribed to and sworn before
me this 9th day of October,
2014.

Margaret a. Nagle
_____
UNITED STATES MAGISTRATE JUDGE

35